Slip Op. 18- 133

## UNITED STATES COURT OF INTERNATIONAL TRADE

DONG-A STEEL COMPANY,

      Plaintiff,

ATLAS TUBE,

      Consolidated Plaintiff,

and

INDEPENDENCE TUBE
CORPORATION,

      Plaintiff-Intervenor,

v.

UNITED STATES,

      Defendant,

and

SEARING INDUSTRIES, SOUTHLAND
TUBE INC., BULL MOOSE TUBE
COMPANY, and HISTEEL CO., LTD,

      Defendant-Intervenors.

Before: Jennifer Choe-Groves, Judge

Consol. Court No. 16-00201

## OPINION

[Sustaining a final determination of sales at less than fair value issued by the U.S. Department of Commerce following the antidumping duty investigation of heavy walled rectangular welded pipes and tubes from the Republic of Korea.]

Dated: October 3, 2018

Jarrod M. Goldfeder, Trade Pacific PLLC, of Washington, D.C., argued for Plaintiff Dong-A Steel Company.  With him on the brief was Robert G. Gosselink.  Jonathan M. Freed also appeared.

Christopher T. Cloutier, Schagrin Associates, of Washington, D.C., argued for Consolidated Plaintiff and Defendant-Intervenor Atlas Tube and Defendant-Intervenors Searing Industries and Bull Moose Tube Company.  With him on the brief was Roger B. Schagrin.  Elizabeth J. Drake, John W. Bohn, and Paul W. Jameson also appeared.

Timothy C. Brightbill and Cynthia C. Galvez, Wiley Rein LLP, of Washington, D.C., for Plaintiff-Intervenor and Defendant-Intervenor Independence Tube Corporation and Defendant-Intervenor Southland Tube Inc.  With them on the brief was Alan H. Price.  Adam M. Teslik, Christopher B. Weld, Derick G. Holt, Jeffrey O. Frank, Laura El-Sabaawi, Maureen E. Thorson, Robert E. DeFrancesco, III, Stephanie M. Bell, Tessa V. Capeloto, and Usha Neelakantan also appeared.

Tara K. Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Zachary Simmons, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.  Mercedes C. Morno, Of Counsel, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C., also appeared.

Jeffrey M. Winton and Daniel E. Parga, Law Office of Jeffrey M. Winton PLLC, of Washington, D.C., argued for Defendant-Intervenor HiSteel Co., Ltd.  Amrietha Nellan also appeared.

Choe-Groves, Judge:  This case involves an antidumping duty investigation of heavy

walled rectangular welded carbon steel pipes and tubes from the Republic of Korea ("Korea").

The court reviews a final antidumping duty determination issued by the U.S. Department of

Commerce ("Commerce" or "Department") concluding that imports of heavy walled rectangular

welded carbon steel pipes and tubes from Korea are being, or are likely to be, sold at less than

fair value.  See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the

Republic of Korea, 81 Fed. Reg. 47,347 (Dep't Commerce July 21, 2016) (final determination of

sales at less than fair value) ("Final Determination"); see also Issues and Decision Memorandum

for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Heavy

Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea, A-580-880, (July 14, 2016), <u>available at</u> http://enforcement.trade.gov/frn/summary/korea-south/2016-17313-1.pdf (last visited Sept. 28, 2018) ("Final Decision Memorandum").

Dong-A Steel Company ("DOSCO"), Atlas Tube ("Atlas Tube"), and Independence Tube Corporation ("Independence Tube") filed Rule 56.2 motions for judgment on the agency record.  <u>See</u> Pl.'s Rule 56.2 Mot. J. Agency R., Feb. 27, 2017, ECF No. 46; Mem. Supp. Rule 56.2 Mot. Pl., Dong-A Steel Company, J. Agency R., Feb. 27, 2017, ECF No. 48 ("DOSCO's Br."); Mot. Atlas Tube J. Agency R. USCIT Rule 56.2, Feb. 27, 2017, ECF No. 45; Public Mem. L. Supp. Atlas Tube's Mot. J. Agency R., Feb. 27, 2017, ECF No. 45 ("Atlas Tube's Br."); Pl.-Intervenor Independence Tube Corporation Rule 56.2 Mot. J. Agency R., Feb. 27, 2017, ECF No. 49; Mem. Pl.-Intervenor Independence Tube Corporation Supp. Mot. J. Agency R., Feb. 28, 2017, ECF No. 52 ("Independence Tube's Br.").  The motions challenge the following six aspects of Commerce's final antidumping duty determination as unsupported by substantial evidence or not in accordance with the law:

1.  the decision to use the earlier of either the invoice date or the shipment date as the "date of sale";

2.  the decision to assign full costs to non-prime merchandise;

3.  the decision to adjust DOSCO's reported hot-rolled coil costs for merchandise that was identical in all physical characteristics except for paint;

4.  the decision to compare merchandise on a theoretical weight basis;

5.  the decision to deny a constructed export price offset to DOSCO; and

6.   the decision to use the zeroing methodology in Commerce's differential pricing

analysis.

Defendant United States ("Government") and Defendant-Intervenor HiSteel Co., Ltd.

("HiSteel") oppose the Rule 56.2 motions and request that the court sustain Commerce's final

determination in all respects.  See Def.'s Resp. Pl.'s Rule 56.2 Mots. J. Agency R., June 22,

2017, ECF No. 58 ("Def.'s Resp."); Resp. HiSteel Co., Ltd. Pl.'s & Pl.-Intervenor's Rule 56.2

Mots. J. Agency R., July 6, 2017, ECF No. 59.  The court held oral argument on January 18,

2018.  See Oral Argument, Jan. 18, 2018, ECF No. 84.  For the reasons set forth below, the court

upholds Commerce's final determination in its entirety.

## PROCEDURAL HISTORY

Atlas Tube, Bull Moose Tube Company, EXLTUBE, Hannibal Industries, Inc.,

Independence Tube, Maruichi American Corporation, Searing Industries, Southland Tube, and

Vest, Inc. (collectively, "Petitioners") filed petitions seeking an antidumping duty order on heavy

walled rectangular welded carbon steel pipes and tubes from Korea.  See Heavy Walled

Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea, Mexico, and the

Republic of Turkey, 80 Fed. Reg. 49,202, 49,203 (Aug. 17, 2015) (initiation of less-than-fair-

value investigations).  Commerce initiated a less-than-fair-value investigation of the subject

merchandise from Korea.  See id. at 49,205.  Commerce selected DOSCO and HiSteel as

mandatory respondents because they were the two largest publicly-identifiable producers and

exporters of heavy walled rectangular welded carbon steel pipes and tubes by volume.  See

Decision Memorandum for the Preliminary Determination in the Antidumping Duty

Investigation of Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the

Republic of Korea (Korea) at 2, A-580-880, (Feb. 22, 2016), available at

http://enforcement.trade.gov/frn/summary/korea-south/2016-04520-1.pdf (last visited Sept. 28,

2018) ("Preliminary Decision Memorandum"); see also Respondent Selection for the

Antidumping Duty Investigation of Heavy Walled Rectangular Welded Carbon Steel Pipes and

Tubes from the Republic of Korea, PD 25, bar code 3302635-01 (Sept. 4, 2015).

 DOSCO and HiSteel submitted timely responses to Commerce's initial questionnaire in

October and November 2015.  See HiSteel Response to Section A of Questionnaire, CD 13–17,

bar code 3405116-01 (Oct. 13, 2015) ("HiSteel Sec. A Resp."); DOSCO Section A Response,

CD 18–23, bar code 3405151-01 (Oct. 13, 2015) ("DOSCO Sec. A Resp."); Response of HiSteel

Co., Ltd. to Sections B and C of the Department's September 11 Questionnaire, CD 27, bar code

3412811-02 (Nov. 2, 2015) ("HiSteel Sec. B–C Resp."); Response of HiSteel Co., Ltd. to

Section D of the Department's September 11 Questionnaire, CD 32, bar code 3414319-02 (Nov.

5, 2015) ("HiSteel Sec. D Resp."); DOSCO Sections B, C, and D Responses, CD 34–39, bar

code 3415176-01 (Nov. 5, 2015) ("DOSCO Sec. B–D Resp.").  Commerce issued supplemental

questionnaires to DOSCO and HiSteel, for which timely responses were submitted.  See HiSteel

Response to October 19 Supplemental Questionnaire, CD 46–52, bar code 3416611-01 (Nov. 12,

2015) ("HiSteel Suppl. Sec. A Resp."); DOSCO Supplemental Section A Response, CD 53, bar

code 3418591-01 (Nov. 19, 2015); HiSteel Response to November 19 Supplemental Section D

Questionnaire, CD 60–61, bar code 3427422-01 (Dec. 21, 2015) ("HiSteel Suppl. Sec. D

Resp."); DOSCO Supplemental Section D Response, CD 71, bar code 3427490-01 (Dec. 18,

2015); DOSCO Supplemental Sections A–C Response, CD 75–78, bar code 3430118-01 (Jan. 5,

2016) ("DOSCO Suppl. Sec. A–C Resp.").

In its preliminary determination, Commerce assigned weighted-average dumping margins of 2.53 percent to DOSCO and 3.81 percent to HiSteel.  See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea, 81 Fed. Reg. 10,585, 10,586 (Dep't Commerce Mar. 1 2016) (preliminary determination of sales at less than fair value and postponement of final determination); Preliminary Decision Memorandum at 2.  After considering the parties' arguments in their administrative case and rebuttal briefs, Commerce issued its final determination on July 21, 2016.  See Final Determination, 81 Fed. Reg. at 47,347. Commerce calculated margins of 2.34 percent for DOSCO and 3.82 percent for HiSteel.  See id. at 47,348.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012), and 28 U.S.C. § 1581(c).  The court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## ANALYSIS

### I.      Date of Sale

The first issue before the court is whether Commerce erred in deciding to use the earlier of either the invoice date or the shipment date as the "date of sale," rather than using the purchase order date.  Atlas Tube and Independence Tube argue that Commerce erred by ignoring both precedent and record evidence and ask the court to find that Commerce's actions were neither supported by substantial evidence nor in accordance with the law.  See Atlas Tube's Br.

10; Independence Tube's Br. 2, 7.  The Government counters that Commerce's decisions

regarding date of sale were reasonable and should be upheld because the dates used best

reflected when the material terms of sale were established.  See Def.'s Resp. 9–14.

Commerce issued antidumping duty questionnaires to DOSCO and HiSteel after selecting

the two companies as mandatory respondents in this investigation.  See Preliminary Decision

Memorandum at 2; see also Respondent Selection for the Antidumping Duty Investigation of

Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea,

PD 25, bar code 3302635-01 (Sept. 4, 2015).  DOSCO and HiSteel were required to report the

date of sale for home market sales and U.S. market sales in each company's questionnaire

response.  For home market sales, both DOSCO and HiSteel reported the earlier of the date of

shipment from the factory or the date of invoice to the unaffiliated customer as the date of sale.

See Preliminary Decision Memorandum at 7 (citing DOSCO Sec. B–D Resp. at B-15; HiSteel

Sec. B–C Resp. at 12).  For U.S. market sales, DOSCO reported the date of shipment from the

factory in Korea as the date of sale for constructed export price sales and the date of invoice as

the date of sale for export price sales, and HiSteel reported the date of invoice to the first

unaffiliated customer as the date of sale for all of its U.S. sales.  See id.; see also DOSCO Sec.

B–D Resp. at C-16 (clarifying DOSCO's previous Section A Response and explaining that the

date of shipment is the date of sale for constructed export price sales, while the date of invoice is

the date of sale for export price sales); HiSteel Sec. B–C Resp. at 49.

Commerce stated that it "has a long-standing practice of finding that, where the shipment

date precedes the invoice date, the shipment date better reflects the date on which the material

terms of sale are established."  Id. (footnotes omitted).  Accordingly, Commerce decided

preliminarily to use "the earlier of the invoice date or the shipment date as the date of sale in

both markets, in accordance with [its] practice." Id. at 8.

Petitioners disputed the date of sale for U.S. market sales selected by Commerce in the

preliminary determination.  Petitioners argued that Commerce:

> [S]hould instead use the date of the purchase order because: 1) under the
> Department's regulations, the Department may use a different date if it better
> reflects when the respondent establishes the material terms of sale; 2) both
> respondents intended the terms of sale to be final as of that date; and 3) sales
> documentation submitted by both respondents demonstrates that there were no
> changes to the material terms of sale after the purchase order date.

Final Decision Memorandum at 4 (footnotes omitted).  Petitioners requested that Commerce

either request additional information or, pursuant to 19 U.S.C. § 1677e, adjust the reported date

of sale using facts available because the purchase order information for DOSCO and HiSteel was

not on the record.  Id. at 5.

In the final determination, Commerce "continue[d] to find that the earlier of factory

shipment date or invoice date correctly reflects the date on which the material terms of

DOSCO's and HiSteel's U.S. sales are finalized."  Final Decision Memorandum at 6.

Commerce relied upon the fact that HiSteel reported the invoice date as the date of sale for

export price sales, whereas DOSCO reported the invoice date as the date of sale for export price

sales and the shipment date as the date of sale for constructed export price sales.  Id. (citing

HiSteel Sec. B–C Resp. at 49; DOSCO Sec. B–D Resp. at C-16).  Commerce verified that the

prices and/or quantities can and do change after the order date, and both DOSCO and HiSteel

provided documentation stating that the changes exceeded the allowable tolerance.  See id.

(citing DOSCO Sec. A Resp. at A-23–A-24; DOSCO Suppl. Sec. A–C Resp. at 3, Ex. SA-4;

HiSteel Sec. A Resp. at 21, App'x A-6-B; Heavy Walled Rectangular Welded Carbon Steel

Pipes and Tubes from the Republic of Korea—Sales Verification Exhibits at Ex. 17, CR 253–

258, 262–270, bar code 3451968-40 (Apr. 1, 2016) ("HiSteel Ex. VE-17")).  Commerce

disagreed with Petitioners' contention that the purchase order date should be used as the date of

sale for U.S. market sales because Commerce found "that the portion of any given order that

never shipped is a change to the quantity originally ordered by the customer."  Id. at 6–7.

Commerce determined that the purchase order date was not a better reflection of the material

terms of sale established by the respondents and their customers than the invoice or shipment

date.  See id.

        Commerce must conduct a "fair comparison" of normal value and export price in

determining whether merchandise is being, or is likely to be, sold at less than fair value.  See 19

U.S.C. § 1677b(a); see also Smith-Corona Grp. v. United States, 713 F.2d 1568, 1578 (Fed. Cir.

1983).  In doing so, normal value must be from "a time reasonably corresponding to the time of

sale used to determine the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(A).

Commerce has promulgated the following regulation regarding the date that should be used as

the date of sale for purposes of comparing normal value and export price:

> In identifying the date of sale of the subject merchandise or foreign like product,
> [Commerce] *normally* will use the date of invoice, as recorded in the exporter or
> producer's records kept in the ordinary course of business.  However, [Commerce]
> *may use a date other than the date of invoice* if [Commerce] is satisfied that a
> different date better reflects the date on which the exporter or producer establishes
> the material terms of sale.

19 C.F.R. § 351.401(i) (2016) (emphasis added).  This Court has previously held that the

material terms of a sale generally include the price, quantity, and payment terms.  See USEC Inc.

v. United States, 31 CIT 1049, 1055, 498 F. Supp. 2d 1337, 1344–45 (2007).  The important

factor to determine is when the parties have reached a "meeting of the minds."  Nucor Corp. v.

United States, 33 CIT 207, 249, 612 F. Supp. 2d 1264, 1300 (2009).

　　　　In promulgating the implementing regulation, Commerce explained that "as a matter of

commercial reality, the date on which the terms of a sale are first agreed is not necessarily the

date on which those terms are finally established" because "price and quantity are often subject

to continued negotiation between the buyer and the seller until a sale is invoiced."  Antidumping

Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,348 (Dep't Commerce May 19, 1997).

"[A]bsent satisfactory evidence that the terms of sale were finally established on a different date,

the Department will presume that the date of sale is the date of invoice. . . .  If the Department is

presented with satisfactory evidence that the material terms of sale are finally established on a

date other than the date of invoice, the Department will use that alternative date as the date of

sale."  Id. at 27,349.  Commerce will rely on the date provided on the invoice "as recorded in a

firm's records kept in the ordinary course of business."  Id. at 27,348.  Rather than determine the

date of sale for each sale, Commerce prefers to use a single and uniform source for the date of

sale for each respondent.  Id.  The party seeking a date other than the invoice date bears the

burden of presenting Commerce with sufficient evidence demonstrating that "another date . . .

'better reflects the date on which the exporter or producer establishes the material terms of

sale.'"  Viraj Group, Ltd. v. United States, 343 F.3d 1371, 1377 n.1 (Fed. Cir. 2003) (citing 19

C.F.R. § 351.401(1)).

　　　　Commerce applied its regulatory presumption correctly in favor of the earlier invoice

date or shipment date when conducting its date of sale analysis in this case.  Commerce

considered documents provided by DOSCO and HiSteel that were kept in the ordinary course of

business in accordance with 19 C.F.R. § 351.401(i).  Evidence on the record established that

DOSCO reported the date of shipment from the factory in Korea as the date of sale for

constructed export price sales and the date of invoice as the date of sale for export price sales.

Evidence on the record established that HiSteel reported the date of invoice as the date of sale for

all of its U.S. sales.  See Final Decision Memorandum at 6 (citing DOSCO Sec. B–D Resp. at

C-16; HiSteel Sec. B–C Resp. at 49).  Commerce found that the invoice date or shipment date

represented a meeting of the minds because evidence on the record showed that the quantities

changed after the purchase order date in amounts greater than the allowable tolerance specified

by the contract.  See id.; see also DOSCO Sec. B–D Resp. at C-16; HiSteel Sec. B–C Resp. at

49; DOSCO Sec. A Resp. at A-23–A-24; DOSCO Suppl. Sec. A–C Resp. at 3, Exhibit SA-4;

HiSteel Suppl. Sec. A Resp. at 21; HiSteel Sec. A Resp. at App'x A-6-B; HiSteel Ex. VE-17.

Thus, because substantial evidence on the record supports Commerce's selection of the invoice

date and shipment date as reflecting the meeting of the minds, the court finds that Commerce did

not err in its selection of invoice date or shipment date as the date of sale.

     Atlas Tube and Independence Tube have the burden of proof to demonstrate that another

proposed date better reflects the date on which the material terms of sale were established.  19

C.F.R. § 351.401(i).  Atlas Tube and Independence Tube argue that the purchase order date best

reflects the date of sale because the mandatory respondents and their customers had a meeting of

the minds and intended the terms to be final on that date.  See Atlas Tube's Br. 16–20;

Independence Tube's Br. 8–12.

With respect to HiSteel, Atlas Tube and Independence Tube argue that HiSteel and its customer had the necessary meeting of the minds on the purchase order date, demonstrated by HiSteel's sample sales documentation showing that the quantity shipped was within the tolerance level shown on the purchase order.  See Atlas Tube's Br. 16–17; Independence Tube's Br. 9–10. This argument fails, however, because Commerce considered numerous other documents on the record showing that quantities shipped were outside the level of tolerance of the purchase order and concluded reasonably that there was no meeting of the minds on the purchase order date. For example, a sample direct U.S. sale order submitted by HiSteel showed that the difference in the ordered quantity from the purchase order dated September 18, 2014 and the quantity stated in the commercial invoice dated November 13, 2014 exceeded the permitted tolerance stated in the terms of the purchase order.  See HiSteel Sec. A Resp. at 21, App'x A-6-B.  Commerce cited another example of a direct U.S. sale order where the difference in the quantity listed in the purchase order dated March 25, 2015 and the quantity stated in the commercial invoice dated May 7, 2015 also exceeded the allowed tolerance.  See HiSteel Ex. VE-17.  For an indirect sale (through the Korean unaffiliated intermediary), the difference between the ordered quantity from the purchase order dated January 12, 2015 and the quantity stated in the bill of lading dated March 15, 2015 appears to be within the permitted tolerance level.  See HiSteel Sec. A Resp. at 21, App'x A-6-B.  HiSteel itself states that "U.S. sales are made pursuant to written purchase orders, which specify the price and estimated quantity," but "[t]he final quantity is not fixed . . . until the merchandise is loaded for shipment to the United States and the invoice is prepared." HiSteel Sec. A Resp. at 21.  Atlas Tube and Independence Tube, as the Parties seeking a date other than the invoice date, did not meet their burden of proof to demonstrate that the purchase

order date best reflected when the material terms of sale were established.  See Viraj Group, 343
F.3d at 1377 n.1.  The majority of sales documentation considered by Commerce showed that the
quantity, a material term of sale, was not established until the invoice date or shipment date.  See
USEC Inc., 31 CIT at 1055, 498 F. Supp. 2d at 1344–45 (2007).  Commerce's selection of the
invoice date or shipment date as the date of sale for HiSteel was therefore reasonable and
supported by substantial evidence.

     With respect to DOSCO, Atlas Tube and Independence Tube argue that DOSCO and its
customer had the necessary meeting of the minds on the purchase order date and that the
canceled portions of the purchase order should not be considered changes in the material terms
of sale.  See Atlas Tube's Br. 17–18; Independence Tube's Br. 11.  Atlas Tube and Independence
Tube have the burden to show that the purchase order date better reflects the material terms of
sale.  See Viraj Group, 343 F.3d at 1377 n.1.  DOSCO stated that "[f]or U.S. sales, quantity and
delivery terms can change up until shipment from DOSCO's factory," and that "[q]uantity can
change after the initial purchase order and order confirmation, for instance, because of overruns
and shortages."  DOSCO Sec. A Resp. at A-23.  Documents on the record show that quantities
stated in the purchase order differed significantly from the shipped quantities and exceeded the
allowed tolerances.  See DOSCO Suppl. Sec. A–C Resp. at Ex. SA-4.  Atlas Tube and
Independence Tube contend that the discrepancy in quantity was due to the buyer's cancellation
of portions of the order, and that by discounting the canceled portions of the order, the quantities
shipped could be viewed as being within the allowed tolerances.  Commerce reasoned, however,
that "the portion of any given order that never shipped is a change to the quantity originally
ordered by the customer."  Final Decision Memorandum at 6–7.  It was reasonable to view the

canceled portions and difference in shipped quantities to be a variance in the material terms of

sale.  Because the evidence on the record demonstrated that shipped quantities were significantly

fewer than the purchase order quantities and were outside the allowed tolerances, it was

reasonable for Commerce to find that Petitioners did not sufficiently establish that there was a

required meeting of the minds regarding the quantity of products at the time of the purchase

order.  See USEC Inc., 31 CIT at 1055, 498 F. Supp. 2d at 1344–45.  Commerce's decision to

use the earlier of the invoice date or the shipment date for DOSCO was reasonable and supported

by evidence on the record.  Based on the foregoing, the court affirms Commerce's decision to

use the earlier of the invoice date or shipment date as the date of sale.

**II.     Assignment of Costs for Non-Prime Merchandise**

The second issue before the court is whether Commerce's decision to assign full costs to

the non-prime heavy walled rectangular welded carbon steel pipe and tube was supported by

substantial evidence.  The Government argues that Commerce reasonably determined that full

costs were appropriate based on the review of record evidence for the non-prime merchandise of

both DOSCO and HiSteel.  Atlas Tube and Independence Tube argue that Commerce erred by

not adjusting the costs for non-prime merchandise reported by DOSCO and HiSteel.

Atlas Tube and Independence Tube argue that full production costs should not be

assigned to non-prime merchandise based on: (1) evidence on the record demonstrating that non-

prime merchandise was sold at a discount without certification or warranty, and (2) lack of

record evidence showing that non-prime products are generally used for the same applications as

prime products.  Final Decision Memorandum at 13.  Commerce reviewed the record evidence

and concluded that DOSCO's non-prime products were rusted pipes, and HiSteel's non-prime

products consisted of products with minor defects, including dents or weld defects, that

prevented HiSteel from certifying the product as free from deformities.  See Final Decision

Memorandum at 15 (Verification of the Cost Response of Dong-A Steel Company in the

Antidumping Duty Less Than Fair Value Investigation of Heavy Walled Rectangular Welded

Carbon Steel Pipes and Tubes from the Republic of Korea at 21, CD 273, bar code 3456223-01

(Apr. 5, 2016) ("DOSCO Cost Verification Report"); HiSteel Suppl. Sec. D Resp. at 7).

Commerce concluded that the record documents showed that DOSCO's non-prime products

were used in the same general applications as prime products, and HiSteel's customers could use

the non-prime and prime products interchangeably for any suitable application.  See id. (citing

DOSCO Cost Verification Report at 21; HiSteel Suppl. Sec. D Resp. at 7).  Commerce found

that the sales prices of DOSCO's and HiSteel's non-prime products do not reflect a significant

difference from the sales prices of prime products.  See id. (citing DOSCO Cost Verification

Report at 21; HiSteel Suppl. Sec. D Resp. at App'x SD-4).  Based on the record evidence,

Commerce elected not to adjust the costs assigned to non-prime products because it found that

the costs calculated by DOSCO and HiSteel reasonably reflect the costs associated with the

production of the subject merchandise.  Id.

Atlas Tube and Independence Tube counter that Commerce should have adjusted the

costs reported by DOSCO and HiSteel.  Atlas Tube and Independence Tube argue that

Commerce erred because record evidence established that non-prime merchandise was sold

without certification or warranty at a thirty-percent discount from prime merchandise; there was

no evidence that non-prime merchandise is generally used for the same applications as prime

merchandise; Commerce has a practice of treating non-prime sales as scrap that is not assigned

costs; and non-prime merchandise differs from prime merchandise in inventory values.  <u>See</u>

Atlas Tube's Br. 21–25; Independence Tube's Br. 13–15.

Commerce normally calculates costs "based on the records of the exporter or producer of

the merchandise, if such records are kept in accordance with generally accepted accounting

principles ["GAAP"] of the exporting country (or the producing country, where appropriate) and

reasonably reflect the costs associated with the production and sale of the merchandise."  19

U.S.C. § 1677b(f)(1)(A).  When an exporter or producer has reported costs of downgraded or

non-prime merchandise, Commerce determines whether the reported costs reasonably reflect

actual costs incurred in producing the merchandise.  Commerce seeks to determine whether it is

possible to use the non-prime merchandise in the same applications as the prime merchandise.

<u>See</u> <u>Tension Steel Indus. Co., Ltd. v. United States</u>, 40 CIT __, __, 179 F. Supp. 3d 1185, 1194–

95 (2016).  To make this determination, it is Commerce's stated practice to "analyze the products

sold as non-prime on a case-by-case basis to determine whether the downgraded products remain

in scope, and likewise can still be used in the same applications as subject merchandise."  Final

Decision Memorandum at 14.  This analysis does not involve judging the relative values and

qualities between grades; instead, Commerce determines whether it is possible to use the non-

prime product in the same general manner as its prime counterparts.  <u>See</u> <u>id.</u> at 14–15.

Commerce assigns the same costs of production for non-prime merchandise as prime

merchandise if it determines that the non-prime product can be used in the same general

applications as its prime product counterparts.  <u>See</u> <u>id.</u>  Commerce offsets costs with the revenue

gained from sales of non-prime products (<u>i.e.</u>, a scrap offset) if it determines that the non-prime

product cannot be used in the same general manner as its prime product counterparts.  <u>See</u> <u>id.</u>

With respect to DOSCO's non-prime products (such as defective or rusted pipes),
Commerce verified that DOSCO allocates the same costs to non-prime products as prime
products in its books and records, which were kept in accordance with Korean GAAP.  See
DOSCO Cost Verification Report at 21.  The non-prime products were sold at a discount and
without a warranty, but evidence on the record includes DOSCO's statements that customers
generally use the non-prime products for the same applications as prime products, such as
identical light load-bearing applications.  See id.  Despite the discounted sales prices, Commerce
determined that "the sales (i.e., market) prices of DOSCO's non-prime products do not reflect a
significant difference from the full costs that the company assigns to them in the normal course
of business."  Final Decision Memorandum at 15 (citing DOSCO Cost Verification Report at
21).  The non-prime products are manufactured using the same materials and undergo the same
production processes as prime products, indicating that the production costs for both types of
products are comparable, if not the same.  See id.  Commerce's decision was supported by the
fact that DOSCO documented sales of non-prime products in its sales database in the normal
course of its business operation.  See DOSCO Cost Verification Report at 21.  Based on the
evidence on the record, Commerce determined that DOSCO's records assigning full costs to
non-prime merchandise reasonably reflected the costs associated with the production and sale of
non-prime merchandise.  The court affirms Commerce's decision to assign full costs to
DOSCO's non-prime merchandise.

With respect to HiSteel's non-prime merchandise, HiSteel's production process produces
non-prime merchandise in the form of "dents, weld-defects, or other deformations" and other
products that "developed excessive surface rust while stored in inventory."  See HiSteel Suppl.

Sec. D Resp. at 6, App'x SD-4; HiSteel Sec. D Resp. at 4.  The minor defects prevent the non-

prime products from meeting industry specifications.  HiSteel Sec. D Resp. at 4.  These non-

prime products are "sold as off-grade pipe [and] are treated as fully-costed products, and not as

scrap, in HiSteel's normal accounting system."  Id.  The defects of the non-prime products

identified at the conclusion of the production process prevent HiSteel "from warranting that the

product conforms to the relevant industry specifications and has no defects."  HiSteel Suppl. Sec.

D Resp. at 6–7.  However, "[c]ustomers may use prime and non-prime products in any

applications for which they consider the products suitable."  Id. at 7.  HiSteel treats prime and

non-prime products as distinct products and maintains records of the actual costs incurred for the

production of each.  See id. at 7, App'x SD-4.

　　　HiSteel provided per-unit inventory values of non-prime and prime products for three

styles of pipe: (1) General Structural Rectangular Pipe (400 KS), (2) Structural Rectangular Pipe

Gr. B, and (3) General Structural Rectangular Pipe (JIS 490 Hyundai).  See id. at App'x SD-4.

For the three styles of pipe, the per-unit inventory values for prime and non-prime products were

similar.  The court concludes that Commerce's assessment of the inventory value data and

determination that the sales prices did not differ significantly were reasonable.

　　　Commerce determined that "the sales prices of non-prime products do not reflect a

significant difference from the sales prices of prime products."  Final Decision Memorandum at

15 (citing HiSteel Suppl. Sec. D Resp. at App'x SD-4).  Commerce examined evidence on the

record that the non-prime products were sold at a discount and without a warranty, but that

customers used the non-prime pipe in applications that each individually found suitable.  See

HiSteel Sec. D Resp. at 4.  Commerce also noted that HiSteel included its sales of non-prime

merchandise in its sales database.  See id.

Substantial evidence on the record supports Commerce's decision to assign full costs to

HiSteel's production of non-prime merchandise.  HiSteel's products undergo the same

production process during which some products are dented, incorrectly welded, or otherwise

deformed.  See HiSteel Sec. D Resp. at 4–7.  HiSteel stated that both prime and non-prime

products may be used in any suitable application but cannot warrant that the non-prime products

conform to industry specifications.  See id. at 7.  There is no evidence suggesting that the non-

prime products are unsuitable for use in the same general applications as prime products.  Record

evidence established that non-prime products with weld defects or excessive surface rust were

generally used by customers for the same applications as prime merchandise.  See Final Decision

Memorandum at 15; see also DOSCO Cost Verification Report at 21; HiSteel Suppl. Sec. D

Resp. at 7.  Commerce's decision was supported by the fact that HiSteel documented sales of

non-prime merchandise in its sales database in the normal course of its business operations.  See

HiSteel Suppl. Sec. D Resp. at App'x SD-4.  Based on the evidence on the record, it was

reasonable for Commerce to determine that HiSteel's records assigning full costs to non-prime

merchandise adequately reflected the costs associated with the production and sale of non-prime

merchandise.  The court concludes that Commerce's decision to assign full costs to HiSteel's

non-prime merchandise was supported by substantial evidence.

III.    **Adjustment to Reported Hot-Rolled Coil Costs**

The third issue before the court is whether Commerce erred in deciding to adjust

DOSCO's reported hot-rolled coil costs for products that were identical in all physical

characteristics except for paint.  Plaintiff argues that Commerce erred in adjusting its reported

costs for painted products by ignoring evidence establishing the reasonableness and accuracy of

DOSCO's reported raw material costs.  See DOSCO's Br. 35–39.  The Government argues that

Commerce acted properly when it determined that DOSCO's records did not reasonably reflect

the different production costs for two control numbers that are physically identical except for one

being painted.  See Def.'s Resp. 33–36.

In the preliminary determination, Commerce adjusted DOSCO's reported raw material

costs for product control numbers that were identical in all physical characteristics except

painting to reflect the same hot-rolled coil costs.  See Final Decision Memorandum at 50.

DOSCO argued that the reported costs were derived from the company's books and that records

were kept in accordance with GAAP.  See id.  DOSCO alleged that any recorded differences in

cost were attributable to production timing issues and product mix.  See id.  DOSCO explained

that because hot-rolled coil prices were higher during the start of the period of investigation,

products produced during this period had higher raw material costs compared to those produced

at the end of the period of investigation.  See id.  DOSCO's records showed that some product

control numbers were produced and sold in limited quantities during the period of investigation.

See DOSCO Cost Verification Report at 19.  In the final determination, Commerce found that

the timing of the coil purchase and pipe production influenced the cost, not the pipe's physical

characteristics.  See Final Decision Memorandum at 52–53.

Raw material costs for products shall normally be calculated based on the records of the

exporter or producer of the merchandise.  19 U.S.C. § 1677b(f)(1)(A).  The statute requires that

the records: (1) must be kept in accordance with the generally accepted accounting principles of

the exporting country, and (2) reasonably reflect the costs associated with the production and

sale of the merchandise.  Id.  In other words, the statute provides that as a general rule, an agency

may either accept financial records kept according to generally accepted accounting principles in

the country of exportation, or reject the records if accepting them would distort the company's

true costs.  Am. Silicon Techs. v. United States, 261 F.3d 1371, 1377 (Fed. Cir. 2001) (citing

Thai Pineapple Pub. Co., Ltd. v. United States, 187 F.3d 1362, 1366 (Fed. Cir. 1999); NTN

Bearing Corp. v. United States, 74 F.3d 1204, 1206 (Fed. Cir. 1995)).  Commerce is directed to

consider all available evidence on the proper allocation of costs.  19 U.S.C. § 1677b(f)(1)(A).

     Physical characteristics are a prime consideration when Commerce conducts its analysis.

Thai Plastic Bags Indus. Co., Ltd. v. United States, 746 F.3d 1358, 1368 (Fed. Cir. 2014).  If

factors beyond the physical characteristics influence the costs, however, Commerce will

normally adjust the reported costs in order to reflect the costs that are based only on the physical

characteristics.  See id.  Commerce interprets the proper allocation of adjustment to costs.  Id.

     DOSCO claims that Commerce's adjustments to its raw material costs for painted

products unreasonably and unlawfully ignored verified record evidence establishing the

reasonableness and accuracy of DOSCO's reported costs.  See DOSCO's Br. 35.  Plaintiff

contends that the specific reported costs from DOSCO's books are the most accurate and should

be used to determine the cost of production.  See id. at 36–37.  Commerce does not dispute that

DOSCO's accounting practices met Korean GAAP as required by 19 U.S.C. § 1677b(f)(1)(A).

The court finds that substantial evidence supports Commerce's conclusion that DOSCO's

accounting practices conformed with Korean GAAP.  The court's analysis is focused, therefore,

upon whether Commerce was reasonable in determining that the reported costs did not reflect the true costs of production for the product control numbers.

Commerce had to determine whether the reported costs were a reasonable reflection of the cost of production.  See 19 U.S.C. § 1677b(f)(1)(A).  The two product control numbers in question have identical physical characteristics except for one being painted.  See Final Decision Memorandum at 50.  For each of these products, Commerce traced the direct material costs from the cost buildup worksheets to the weight-averaging worksheets and then divided the total direct material costs for the period of investigation by the total production for the period of investigation.  See DOSCO Cost Verification Report at 19.  Commerce found that the significant cost differences between the two product control numbers could not be explained by the physical characteristic of one being painted and the other not painted, which was the single physical difference.  See Final Decision Memorandum at 52 (citing DOSCO Cost Verification Report at 19).  DOSCO and Commerce both agree that the differences in the costs were based on (1) the fluctuation of the cost of coil prices during the period of investigation, as the painted product was produced and sold during limited times of the period of investigation, and (2) the differences in the product perimeters and thicknesses that are classified by the same control number.  See id.; DOSCO's Br. 36–37; DOSCO Cost Verification Report at 5, 19.

Commerce's normal practice is to use the annual average costs of the period of investigation to even out variances in the production costs during different periods of time, as well as fluctuating raw material costs and erratic production levels.  Commerce adjusts these costs to ensure different costs between products are the result only of the physical differences.  Commerce is permitted to consider all available evidence on the proper allocation of costs,

including physical characteristics of the products at issue.  See Thai Plastic Bags, 746 F.3d at 1368.

Here, Commerce determined that the difference in price was based on the fluctuating raw material costs during the period of investigation because one product was produced mainly during only part of the year, a fact with which DOSCO agrees.  See Final Decision Memorandum at 51–53.  The court finds that it was reasonable for Commerce to use annual average costs in order to even out fluctuations in the production costs over short periods of time for goods that only differed based on one being painted and one not being painted.  See 19 U.S.C. § 1677b(f)(1)(A).  It was appropriate for Commerce to make the adjustment in order to have costs that differ only because of physical characteristics so that Commerce can conduct the sales-below-cost test, calculate constructed value, and assess the difference-in-merchandise adjustment properly.  The court finds that Commerce's decision to adjust DOSCO's reported hot-rolled coil costs was reasonable and supported by substantial evidence.

## IV.    Weight Basis for Comparison Methodology

The fourth issue before the court is whether Commerce erred in deciding to compare merchandise on a theoretical weight basis.  DOSCO argues that Commerce should have used actual weight in the final determination.  Defendant contends that DOSCO's favored method of using actual weight is based on nominal values, not actual measurements, and is no more accurate than Commerce's preferred measurement of theoretical weight.

Three types of weight bases were examined in this case.  The court adopts DOSCO's terminology, which DOSCO describes as follows:

- **"Scaled Weight":** This reflects the physical weight that a company determines by placing the finished product on a scale.

- **"Actual Weight":** This reflects the weight determined through the use of a standard industry formula that is based on the actual wall thickness of the finished pipe product.

- **"Theoretical Weight":** This reflects a weight determined through the use of a standard industry formula, but is based on the nominal wall thickness of the input coil, and that nominal wall thickness is subject to tolerances that differ vastly between the home market and the U.S. market.

DOSCO's Br. 5.

DOSCO and HiSteel reported the actual weight and theoretical weight of their finished products.  See DOSCO Sec. A Resp. at A-31–A-32; DOSCO Sec. B–D Resp. at B-19–B-20, C-21–C-22, D-34.  DOSCO did not physically weigh the merchandise.  DOSCO Sec. A Resp. at A-32; DOSCO Sec. B–D Resp. at B-19, C-21.  DOSCO's U.S. customers ordered products based on nominal dimensions and were invoiced based on theoretical weight.  See DOSCO Sec. A Resp. at A-31–A-32, Ex. A-16.  DOSCO argues that actual weight reflects the basis on which DOSCO and its U.S. affiliate set prices and negotiate with its customers.  See DOSCO's Br. 7.  DOSCO states that actual weight is based on the actual measured thickness of the input coil as stated in mill test certificates.  See id. at 7–8.

In the preliminary determination, Commerce used theoretical weight to compare normal value with export price and constructed export price.  See Preliminary Decision Memorandum at 4 n.15 (citing Less Than Fair Value Antidumping Duty Investigation of Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Preliminary Determination Calculation for Dong-A Steel Company (DOSCO), PD 152, bar code 3444143-01 (Feb. 22, 2016)).  DOSCO challenged the preliminary determination, arguing that it was more

reasonable and accurate to use actual weight to measure and compare prices, expenses, and costs because it is based on the actual wall thickness of the input coil.  <u>See</u> Final Decision Memorandum at 7.  The coil thickness remains the same throughout the production process and is the same as the final pipe or tube thickness.  <u>See</u> <u>id.</u> at 7–8.  DOSCO cited to mill test certificates from its supplier, stating that "[w]e hereby certify that the material has been made in accordance with the order and specification."  <u>See</u> Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea—Sales Verification Exhibits at Exs. 8–22, CD 262–270, bar code 3454562-12 (Apr. 1, 2016).

In its final determination, Commerce determined that the recorded thickness of the input coil is not an actual measured thickness, based on HiSteel's statement that the wall thicknesses of the input coil are theoretical thicknesses that vary within industry tolerances.  <u>See</u> Final Decision Memorandum at 7 (citing Verification of the Sales Response of HiSteel Co., Ltd. in the Antidumping Duty Investigation of Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea at 9, CD 275, bar code 3456605-01 (Apr. 6, 2016) ("HiSteel Sales Verification Report"); Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea—Verification Exhibits at Ex. 6, CD 198–251, bar code 3451968-01 (Mar. 24, 2016) ("HiSteel Verification Exhibits")).  Commerce relied on a mill test certificate provided by HiSteel's supplier.  <u>See</u> HiSteel Verification Exhibits at Ex. 6.  Commerce's product control number also used nominal product dimensions as reported by the respondents to match sales for comparison purposes.  <u>See</u> Final Decision Memorandum at 12.

DOSCO objects to Commerce's decision to compare the products on a theoretical weight basis instead of an actual weight basis.  <u>See</u> DOSCO's Br. 4–16.  Plaintiff puts forth three

arguments to support why Commerce erred in using the theoretical weight instead of the actual weight: (1) Commerce's conclusion that the actual wall thickness is not an actual measured thickness is contradicted by DOSCO's verified record evidence; (2) Commerce's conversion of DOSCO's data from actual weight to theoretical weight introduced distortions into the antidumping duty calculations; and (3) Commerce failed to articulate a reasonable basis to disregard DOSCO's actual weight.  See id. at 4–16.

        With respect to DOSCO's first allegation, DOSCO objects to Commerce's finding that the actual wall thickness is not an actual measurement.  See id. at 12–14.  Commerce used theoretical weight because HiSteel's verification materials stated that input coil measurements were nominal measurements.  See Final Decision Memorandum at 13 (citing HiSteel Sales Verification Report at 9 and HiSteel Verification Exhibits at Ex. 6).  HiSteel's mill test certificate was nearly identical to DOSCO's mill test certificate.  Compare Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea—Cost Verification Exhibits at Ex. 12, CD 126, bar code 3446551-01 (Mar. 4, 2016) with HiSteel Verification Exhibits at Ex. 17.  The court finds that Commerce was reasonable in considering the nearly identical language from DOSCO's and HiSteel's mill test certificates, along with HiSteel's statement that coil measurements are nominal, to mean that if one is based on nominal measurements, then so is the other.  The mill test certificates and HiSteel's statement are sufficient evidence for Commerce to have reached a reasonable conclusion that the actual weight is based on nominal weight.  The court concludes that Commerce's choice to use theoretical weight was reasonable and based upon evidence on the record.

With respect to DOSCO's second allegation, DOSCO argues that Commerce's conversion of the submitted data from actual weight to theoretical weight was unreasonable because it introduced distortions into the antidumping duty calculations.  See DOSCO's Br. 14–16.  According to DOSCO, Commerce should have used actual weight, which represents weight that was calculated from actual measurements of coil thickness and would have prevented the introduction of distortions into the calculation.  See id.  Commerce supported its decision to use theoretical weight based in part on the fact that DOSCO sold products to its U.S. customers using nominal dimensions and admitted that it invoiced on a theoretical weight basis.  See DOSCO Sec. A Resp. at A-31–A-32, Ex. A-16; DOSCO's Br. 10.  Ordering based on nominal dimensions and invoicing on a theoretical weight basis are consistent with using theoretical weight.  Commerce has a "general preference for making sales comparisons on the basis on which U.S. sales were made."  Certain Welded Stainless Steel Pipe From the Republic of Korea, 57 Fed. Reg. 53,693, 53,698 (Dep't Commerce Nov. 12, 1992) (final determination of sales at less than fair value).  Commerce's decision to use theoretical weight is supported by evidence on the record that U.S. customers ordered and were billed using nominal values.  See DOSCO Sec. A Resp. at A-31–A-32, Ex. A-16; DOSCO's Br. 10.

The court finds that Commerce reasonably determined that theoretical weight is based on a nominal value, and it was reasonable for Commerce to determine that utilizing theoretical weight would not decrease any distortions in the calculation compared to actual weight.  The court concludes that Commerce's choice to use theoretical weight rather than actual weight is reasonable and supported by evidence.

### V.       DOSCO's Claim for a Constructed Export Price Offset

The fifth issue before the court is whether Commerce erred in deciding to deny a

constructed export price offset to DOSCO.  DOSCO argues that it provided Commerce with a

complete record to support its claim for a constructed export price offset, and that Commerce's

denial was unreasonable given the evidence on the record.  See DOSCO's Br. 16–23.  DOSCO

contends that substantial record evidence demonstrated that the home market level of trade was

at a distinct and more advanced level compared to the constructed export price level of trade.

See id.  The Government contends that DOSCO failed to meet the requirements and support its

claim for a constructed export price offset.  See Def.'s Resp. 23–32.

As part of its statutory mandate to conduct a "fair comparison" of normal value and

export price, Commerce must make two types of adjustments to normal value based on

differences in the level of trade.  The first type is a level of trade adjustment, 19 U.S.C.

§ 1677b(a)(7)(A), and the second type is a constructed export price offset, 19 U.S.C.

§ 1677b(a)(7)(B).  Commerce will grant a constructed export price offset when "normal value is

established at a level of trade which constitutes a more advanced stage of distribution than the

level of trade of the constructed export price, but the data available do not provide an appropriate

basis to determine . . . a level of trade adjustment."  Id.  When these two conditions are present,

Commerce must lower the normal value "by the amount of indirect selling expenses incurred in

the country in which normal value is determined on sales of the foreign like product but not more

than the amount of such expenses for which a deduction is made."  Id.

Commerce's regulation delineates how the agency will determine whether the home

market level of trade is at a more advanced stage of distribution than the level of trade of the sale

to the U.S. affiliate.  See 19 C.F.R. § 351.412(c)(2).  Commerce compares the selling activities

that the company incurs in selling to the first unaffiliated home market customers to the selling

activities that the company incurs in selling to its U.S. affiliate.  Id.  Commerce must find that

"sales are made at different marketing stages."  Id.  "Substantial differences in selling activities

are a necessary, but not sufficient, condition for determining that there is a difference in the stage

of marketing.  Some overlap in selling activities will not preclude a determination that two sales

are at different stages of marketing."  Id.  The company bears the burden of presenting evidence

to support the grant of a constructed export price offset.  See id. § 351.401(b)(1) ("The interested

party that is in possession of the relevant information has the burden of establishing to the

satisfaction of the Secretary the amount and nature of a particular adjustment."); Ad Hoc Shrimp

Trade Action Comm. v. United States, 33 CIT 533, 556, 616 F. Supp. 2d 1354, 1374 (2009)

("While it is Commerce's responsibility to determine if a petitioner qualifies for a [constructed

export price] offset, it is the responsibility of the respondent requesting the [constructed

export price] offset to procure and present the relevant evidence to Commerce.").

　　　　When calculating the normal value for price comparability, Commerce determined that

DOSCO did not qualify for a level of trade adjustment because DOSCO only had one home

market level of trade, which DOSCO does not contest.  See DOSCO's Br. 17.  Commerce denied

DOSCO a constructed export price offset in its preliminary determination and upheld that

finding in its final determination.  See Preliminary Decision Memorandum at 8–9; Final Decision

Memorandum at 49.  The Department analyzed specific selling activities falling under four

general selling functions: (1) sales and marketing, (2) freight and delivery, (3) inventory

maintenance and warehousing, and (4) warranty and technical support.  See Preliminary

Decision Memorandum at 12; Final Decision Memorandum at 46.  In support of a constructed

export price offset grant and to show an advanced level of trade in the home market, DOSCO

reported additional selling activities: sales forecasting, strategic/economic planning, personnel

training/exchange, advertising, inventory maintenance, sales/marketing support, and market

research in the home market.  See Preliminary Decision Memorandum at 11; Final Decision

Memorandum at 46.  Commerce found that although additional selling activities took place,

these activities were not substantially different from those performed with respect to DOSCO's

U.S. sales such that the home market sales and U.S. sales occurred at two different marketing

stages.  See Preliminary Decision Memorandum at 12; Final Decision Memorandum at 46.

Commerce concluded further that DOSCO failed to provide sufficient documentation showing

how frequently it performed each of the reported additional selling activities despite Commerce's

request for more information.  See id. at 47 n.171; see also DOSCO Section A–C Supplemental

Questionnaire at 2–3, PD 103, bar code 3423796-01 (Dec. 4, 2015); DOSCO Suppl. Sec. A–C

Resp. at 4–5, Ex. SA-5.  The court concludes that Commerce's decision to deny a constructed

export price offset to DOSCO was reasonable and supported by substantial evidence on the

record.

     DOSCO claims that Commerce should have translated documents that were submitted in

Korean.  See DOSCO's Br. 22.  Commerce's regulation clearly requires DOSCO to provide

translations of documents that are important to any claims made in the investigation.  19 C.F.R.

§ 351.303 contains procedural rules regarding documents submitted to Commerce for

consideration in an antidumping or countervailing duty proceeding.  Subsection (e) reads:

> Translation to English. A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department.

19 C.F.R. § 351.303(e).  The court is not persuaded by DOSCO's allegation that Commerce should have requested more documents from DOSCO or that Commerce should have translated documents provided in Korean.  The court concludes that Commerce acted reasonably when it determined that the record did not support the grant of a constructed export price offset because DOSCO failed to provide adequate documentation, did not provide English translations, submitted documents that were outside the period of investigation or not clearly involving the current products, and did not state clearly that the documents were intended to support a constructed export price offset.

DOSCO proffers that Commerce was unreasonable for failing to explain how the facts of the current case differ from numerous prior instances in which Commerce has granted constructed export price offsets for similarly situated respondents.  See DOSCO's Br. 30–32.  DOSCO argues also that Commerce should have considered DOSCO's indirect selling expenses, as Commerce did in other prior determinations.  See id. at 32–33.  Commerce is not bound to a specific formula to determine whether to grant a constructed export price offset.  See 19 C.F.R. § 351.412(c)(2).  Prior Commerce investigations may exemplify Commerce's past practices, but are not dispositive.  See SKF USA Inc. v. United States, 630 F.3d 1365, 1373 (Fed. Cir. 2011); NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009).  Commerce may deviate from past practices if it provides a reasonable explanation for its methodology.

Commerce's "explanations do not have to be perfect, [but] the path of Commerce's decision must be reasonably discernable to a reviewing court." NMB Singapore Ltd., 557 F.3d at 1319–20.  Each investigation is fact-specific and may lead to results that vary on a case-by-case basis.  The court holds that Commerce's denial of a constructed export price offset was reasonable and supported by evidence on the record.

**VI.     Use of "Zeroing" in the Differential Pricing Analysis**

The sixth issue before the court is whether Commerce erred in deciding to use the zeroing methodology in its differential pricing analysis.  DOSCO argues that Commerce's use of zeroing in the preliminary and final determinations is not in accordance with the law because it violates the World Trade Organization ("WTO") Antidumping Agreement.

Commerce's discretion to use zeroing has been upheld as a reasonable interpretation of "dumping margin" in 19 U.S.C. § 1677(35)(A).  See Union Steel v. United States, 713 F.3d 1101, 1109 (Fed. Cir. 2013); Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1347 (Fed. Cir. 2005).  Under 19 U.S.C. § 3533, a regulation or practice of Commerce "may not be amended, rescinded, or otherwise modified" based upon a panel or appellate body decision of the WTO.  See Corus Staal BV, 395 F.3d at 1348 (quoting Timken Co. v. United States, 354 F.3d 1334, 1344 (Fed. Cir. 2004)) ("WTO decisions are 'not binding on the United States, much less this court.'").

DOSCO argues that Commerce's use of zeroing is not in accordance with the law because it violates the WTO Antidumping Agreement.  See DOSCO's Br. 34–35 (citing United States – Anti-Dumping and Countervailing Measures on Large Residential Washers from Korea, WT/DS464/R (Mar. 11, 2016)).  DOSCO contends that Commerce has the ability to discontinue

the use of zeroing as a discretionary practice.  See id. at 34–35 (citing Dongbu Steel Co. v.

United States, 635 F.3d 1363, 1366 (Fed. Cir. 2011)).  Commerce is not bound by adverse WTO

decisions, as Congress has devised a separate process by which an adverse WTO ruling may be

implemented.  See 19 U.S.C. §§ 3533(g)(1), 3538(b).  "[I]f U.S. statutory [or regulatory]

provisions are inconsistent with [WTO treaties], it is strictly a matter for Congress."  Corus Staal

BV, 395 F.3d at 1348 (Fed. Cir. 2005); see also Koyo Seiko Co. v. United States, 551 F.3d 1286,

1291 (Fed. Cir. 2008).  The WTO's adverse ruling regarding the practice of zeroing has not been

implemented into U.S. law, thus Commerce has no obligation to refrain from using zeroing in

this case.  The court concludes that Commerce's decision to use the zeroing methodology was

reasonable and in accordance with the law.

## CONCLUSION

For the reasons set forth above, the court concludes the following:

1. The court sustains Commerce's decision to use the earlier of either the invoice date or

   the shipment date as the "date of sale";

2. The court sustains Commerce's decision to assign full costs to non-prime

   merchandise;

3. The court sustains Commerce's decision to adjust DOSCO's reported hot-rolled coil

   costs for products that were identical in all physical characteristics except for paint;

4. The court sustains Commerce's decision to compare merchandise on a theoretical

   weight basis;

5. The court sustains Commerce's decision to deny a constructed export price offset to

   DOSCO; and

6.   The court sustains Commerce's decision to use the zeroing methodology in its

differential pricing analysis.

The court denies the Rule 56.2 motions for judgment on the agency record filed by

DOSCO, Atlas Tube, and Independence Tube.  Judgment will be issued accordingly.


                                                        /s/ Jennifer Choe-Groves
                                                     Jennifer Choe-Groves, Judge

Dated:     October 3, 2018
               New York, New York